UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-Civ-14350-CANNON/MCCABE

JOHN C. MCCARTHY,

       Plaintiff,

v.

LASHERI BAKER, and
ST. LUCIE COUNTY BOARD OF
COUNTY COMMISSIONERS,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss Plaintiff's Complaint and Incorporated Memorandum of Law ("Motion") (DE 6), which was referred to the undersigned by United States District Judge Aileen M. Cannon (DE 9). For the reasons set forth below, the undersigned recommends that the Motion be **GRANTED** and that Plaintiff be given leave to file an Amended Complaint on the timeline set forth below.

## I.  BACKGROUND

This case arises under 42 U.S.C. § 1983 and concerns drug testing procedures used by the St. Lucie County Pretrial Program (hereafter "County"). Plaintiff alleges the following facts, which the Court accepts as true. On or about October 30, 2019, a state court in St. Lucie County, Florida issued a pretrial release bond to Plaintiff following his arrest on unspecified charges (DE 1 ¶ 7). Plaintiff's bond conditions required him to submit to drug testing (DE 1 ¶¶ 8-9). The County administers drug tests to pretrial releasees using an initial screening test manufactured by Microgenics (DE 1 ¶ 10). According to the Microgenics instructions, the initial screening test

cannot "be relied upon for a new [drug] usage" (DE 1 ¶ 11).  Instead, the instructions advise testers that "a more specific alternative chemical method must be used to obtain a confirmed analytical result" (DE 1 ¶ 11).

On October 31, 2019, Plaintiff underwent a Microgenics drug screening test as part of his initial intake into the County's pretrial program (DE 1 ¶ 9; Ex. A).  Plaintiff tested positive for marijuana (DE 1 ¶ 8).  Plaintiff underwent two (2) more Microgenics drug screening tests, on November 5 and 13, 2019, respectively, once again testing positive for marijuana each time (DE 1 ¶ 9; Ex. A).

Thereafter, on November 21, 2019, a Pretrial Services Officer employed by the County (hereafter "PTS Officer") made the decision to arrest Plaintiff for violating his bond conditions related to new drug use (DE 1 ¶ 13).  The PTS Officer based her arrest decision on the Microgenics screening test results from November 5 and 13, 2019 (DE 1 ¶¶ 12-13).  She did not wait to receive laboratory confirmation testing, but instead relied solely on the screening tests (DE 1 ¶¶ 12-13).

Following his arrest, Plaintiff insisted on his innocence and demanded that confirmation testing be performed (DE 1 ¶ 14).  On December 4, 2019, laboratory confirmation testing showed that Plaintiff's THC/Creatine ratios had steadily declined from 14.27 on October 31, 2019, to 3.35 on November 5, 2019, to 1.49 on November 13, 2019 (DE 1 ¶¶ 9, 15; Ex. A).  This meant that Plaintiff had not committed a new drug usage, but rather, marijuana had steadily left his system over the timeframe of the three (3) screening tests (DE 1 ¶ 15).  Given the obvious error, the State Attorney agreed to reinstate Plaintiff's bond without a hearing (DE 1 ¶ 16).  Plaintiff left custody on December 24, 2019 (DE 1 ¶ 17).

Thereafter, on December 26, 2019, Plaintiff underwent another Microgenics screening test (DE 1 ¶ 18).  Plaintiff once again tested positive for marijuana, so PTS Officer once again arrested

him for new drug use (DE 1 ¶ 18).  PTS Officer again relied upon the Microgenics screening test to make the arrest decision, without waiting for laboratory confirmation (DE 1 ¶ 18).  Later confirmation testing once again disproved any new drug use, so the State Attorney again agreed to reinstate Plaintiff's bond without a hearing (DE 1 ¶ 19).  This second arrest caused Plaintiff to remain incarcerated from January 3, 2020, until January 8, 2020 (DE 1 ¶ 19).

In total, Plaintiff spent thirty-eight (38) days in custody as a result of his two (2) arrests for new drug usages, when in fact he never committed any such violations (DE 1 ¶ 20).  On October 11, 2022, Plaintiff filed a Complaint alleging the following four (4) counts against the Defendants:

- Count I, Civil Rights Violation Under 42 U.S.C. § 1983 against PTS Officer;

- Count II, Common Law False Imprisonment/Arrest against PTS Officer;

- Count III, Civil Rights Violation Under 42 U.S.C. § 1983 against County; and

- Count IV, Common Law False Imprisonment/Arrest against County.

(DE 1 at 4, 6-7, 9).  This Motion followed, seeking dismissal of Counts I and III pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.  STANDARD

In evaluating a Rule 12(b)(6) motion, the Court must accept Plaintiff's allegations as true and construe them in the light most favorable to him.  *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  Although Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," a mere "formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

## III.    DISCUSSION

Counts I and III arise pursuant to 42 U.S.C. § 1983, which creates a cause of action against persons who, acting under color of state law, deprive another of a right, privilege or immunity secured by the Constitution, laws, or treaties of the United States.   Here, Plaintiff alleges Defendants violated his Fourth and Fourteenth Amendment rights by subjecting him to unreasonable searches and seizures and arresting and incarcerating him without probable cause (DE 1 ¶¶ 23-24, 37-38).   Defendants move to dismiss, arguing (1) the doctrine of qualified immunity protects PTS Officer from liability, and (2) Plaintiff cannot establish a *Monell* claim against the County.   The Court will address each argument in turn.

### A.     Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (cleaned up).   "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (cleaned up).   "Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible."  *Id.*

Qualified immunity applies only to state actors in the performance of their official "discretionary functions."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004).

Here, Plaintiff alleges PTS Officer violated his constitutional rights by administering multiple Microgenics screening tests to him and thereafter making decisions to arrest him for violations of his bond conditions (DE 1 ¶¶ 9, 12, 18).  The Court finds these actions to be "discretionary functions."

Once the Court finds a discretionary function, the burden shifts to Plaintiff to demonstrate that qualified immunity does not apply.  *Id.* at 1264.  In order to meet this burden, Plaintiff must satisfy a two-step test:  (1) he must show that PTS Officer committed a constitutional violation, and (2) he must show the constitutional right at issue was "clearly established" at the time of the violation.  *Id.*; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel (not just suggest or raise a question about), the conclusion for every like situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  *Lassiter v. Ala. A&M Univ. Bd. of Trs.*, 28 F.3d 1146, 1150 (11th Cir. 1994).  "Qualified immunity is the rule, not the exception."  *Rowe v. Schreiber*, 139 F.3d 1381, 1385 (11th Cir. 1998).

Here, Plaintiff accuses PTS Officer of two (2) constitutional violations, each of which the Court will address in turn.

### 1.      Unreasonable Search

First, Plaintiff complains that PTS Officer subjected him to "unreasonable searches" (DE 1 ¶¶ 23-24).  This claim fails because Plaintiff agreed, as a condition of his pretrial release bond, to submit to drug testing.  Indeed, Plaintiff's briefing papers concede he has no viable claim that

PTS Officer violated his constitutional rights merely by drug testing him: "There is no argument from the Plaintiff, nor has he ever alleged, that [PTS Officer] was not allowed to drug test the Plaintiff while he was on pre-trial release" (DE 7 at 4-5). Accordingly, Count I should be dismissed to the extent it alleges a claim based on unreasonable searches via drug testing. *Cf. United States v. Yeary*, 740 F.3d 569, 576 (11th Cir. 2014) (approving warrantless search of home where defendant, as a condition of pretrial release, agreed that his home could be searched at any time without prior notice and without a warrant).

### 2. Arrest and Incarceration without Probable Cause

Next, Plaintiff complains that PTS Officer arrested and incarcerated him without probable cause (DE 1 ¶¶ 23-24). The Fourth Amendment prohibits state actors from making warrantless arrests without probable cause. *See Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). Probable cause "does not require convincing proof" that the offense was committed. *Bailey v. Bd. of Ctny. Comm'rs of Alachua Ctny.*, 956 F.2d 1112, 1120 (11th Cir. 1992). It does not require proof beyond a reasonable doubt or even by a preponderance of the evidence. *Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018). Also, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *United States v. Lyons*, 403 F.3d 1248, 1254 (11th Cir. 2005) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

Here, Plaintiff alleges PTS Officer lacked probable cause to arrest him because she acted upon the drug screening test results without waiting for laboratory confirmation (DE 1 ¶¶ 12, 18). Plaintiff cites no caselaw to support this proposition. At least one case, meanwhile, seems to support the opposite proposition, namely, that positive drug screening test results satisfy the standard for probable cause to arrest. *See Richardson v. Morgan*, No. 3:19cv2974/LAC/EMT, 2021 WL 2905419, *6 (N.D. Fla. June 8, 2021) ("Plaintiff's arrest was based on a positive drug screen, which violated the terms of his probation. Hence, Plaintiff's allegations undermine any assertion that probable cause for his arrest was lacking."). Though not directly on point, courts also commonly rely on field test results to support probable cause before laboratory confirmation has been obtained. *See, e.g.*, *United States v. Uricoechea–Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (finding that "agents clearly had probable cause to arrest [defendant] …. [when a] field test of the white powder … indicated the presence of cocaine"); *United States v. Jackson*, No. 6:12–cr–202–Orl–36TBS, 2013 WL 784650, *6 (M.D. Fla. Mar. 1, 2013) ("Once the white cake-like substance discovered in Defendant's right front pocket field-tested positive for cocaine, the officers clearly had probable cause to arrest Defendant.").

Based on the facts currently alleged in the Complaint, the Court finds Plaintiff has not met his burden to show that PTS Officer committed a constitutional violation. That is to say, the Complaint does not allege facts that show PTS Officer arrested Plaintiff without probable cause merely because she acted upon positive drug screening test results without waiting for laboratory confirmation.

Moreover, to overcome qualified immunity, Plaintiff must do more than merely show a constitutional violation. He must also point to specific legal authority that would have given PTS Officer "fair notice" she was violating Plaintiff's constitutional rights. *See Eloy v. Guillot*, 289 F.

App'x 339, 346 (11th Cir. 2008) ("Put another way, the defendant must have fair notice of his [or her] conduct's unconstitutionality, which derives from one of the following sources:  (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable.") (citing *Vinyard*, 311 F.3d at 1350-52).  Here, nothing in the case law or statutes would have alerted PTS Officer that she lacked probable cause to arrest Plaintiff based solely on his drug screening tests (indeed, legal research might have led her to the opposite conclusion).  Count I should therefore be dismissed under the doctrine of qualified immunity.

### B.   *Monell* Claim

Count III alleges a *Monell* claim, so-named after *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978), where the Supreme Court recognized that municipalities qualify as "persons" subject to suit under 42 U.S.C. § 1983.  To demonstrate liability against a municipality, a plaintiff must do more than merely show the municipality employed a tortfeasor, as the doctrine of respondeat superior does not apply to 42 U.S.C. § 1983.  *Id.* at 691.  "[A] city is not vicariously liable under § 1983 for the constitutional torts of its agents:  It is only liable when it can be fairly said that the city itself is the wrongdoer."  *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).

To that end, in *Monell* and its progeny, the Supreme Court has defined very narrow circumstances under which a municipality can be held liable for a constitutional injury.  In this case, Plaintiff has identified two recognized theories of *Monell* liability, each of which the Court will address below.  At the outset, however, to succeed on a *Monell* claim, Plaintiff must first identify a valid underlying constitutional violation.  Absent a violation, the Court need not address whether liability extends to the municipality. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1170-

71 (11th Cir. 2009) ("Absent a constitutional violation, we need not explore whether [county's] policies regarding crisis intervention training violated [plaintiff's] constitutional rights."); *Lozada v. City of New York*, No. 12-CV-0038 (ILG)(JMA), 2013 WL 3934998, at *7 (E.D.N.Y. July 29, 2013) ("When there is no underlying constitutional violation, there can be no liability under *Monell*.").

Here, for the reasons set forth in section III.A above, the Court has already concluded that Count I fails to state a claim for a valid underlying constitutional injury. Accordingly, the *Monell* claim fails and should be dismissed on this basis alone. Nevertheless, and for the sake of completeness, the Court will address Plaintiff's theories of *Monell* liability.

### 1. Custom and Practice

Plaintiff first alleges a "custom and practice" theory (DE 1 ¶¶ 36-38). *Monell* recognizes that municipalities may follow informal customs or practices that cause constitutional violations even though such customs or practices have "not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690-91 (citations omitted). To show a custom or practice, Plaintiff must allege facts that show a widespread pattern of conduct "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). As the custom or practice must be widespread and repeated, "random acts or isolated incidents are insufficient to establish a custom[.]" *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018) ("[T]he plaintiff must allege a 'pattern' of excessive force including specific facts of numerous incidents[.]").

Here, even assuming the Court agreed that PTS Officer arrested Plaintiff without probable cause, the Complaint fails to allege facts that show a widespread practice of similar conduct by PTS Officer and/or other County employees.  Indeed, the Complaint alleges no facts beyond those of Plaintiff's own case.  *See Scott v. Miami-Dade County*, No. 13-civ-23013-Gayles, 2016 WL 9446132, at *4 (S.D. Fla. Dec. 13, 2016) (dismissing § 1983 claim where "Plaintiff alleges facts only about his own case, and fails to allege a single fact involving other instances of alleged constitutional violations resulting from the same allegedly inadequate policies and procedures"); *Asia v. City of Miami Gardens*, No. 14-20117-CIV, 2016 WL 739656, at *8 (S.D. Fla. Feb. 25, 2016) ("Plaintiff has failed to present any evidence of prior incidents of constitutional injuries similar to his ... and his own experience with the City's police officers is insufficient to establish a custom or practice."); *Paylan v. Bondi*, No. 8:15-cv-1366-T-36AEP, 2017 WL 9398657, *20 (M.D. Fla. Feb. 28, 2017) ("But Paylan has submitted no additional facts, beyond those alleged in the Second Amended Complaint about her own situation, to support allegations that a widespread practice of false arrests exists.").  Count III should therefore be dismissed to the extent it alleges a *Monell* claim based on the custom-and-practice theory.

### 2.    Failure to Train

Plaintiff next alleges a "failure to train" theory (DE 1 ¶¶ 34-35).  The Supreme Court recognizes "limited circumstances" under which "failure to train" can give rise to *Monell* liability.  *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  Specifically, inadequate training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388.  To show "'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and that the municipality made a deliberate choice

not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The Eleventh Circuit has repeatedly held that, without notice of a need to train or supervise in a particular area, a municipality cannot be liable as a matter of law under a failure-to-train theory. *Id.*

The Eleventh Circuit has adopted the following pattern jury instructions to describe the elements of a *Monell* failure-to-train claim:

> To succeed on this claim, [name of plaintiff] must prove each of the following facts by a preponderance of the evidence:
>
> First: That [name of officer] violated [name of plaintiff]'s [describe constitutional right, e.g., Fourth Amendment right to be free from excessive force];
>
> Second: That [name of officer] was not adequately [trained, supervised] in [describe relevant area, e.g., the use of deadly force];
>
> Third: That [name of official policy-maker] knew based on at least one earlier instance of unconstitutional conduct materially similar to [name of officer]'s violation of [name of plaintiff]'s constitutional rights that [additional] [training/supervision] was needed to avoid [describe alleged constitutional violation] likely recurring in the future; and
>
> Fourth: That [name of official policy-maker] made a deliberate choice not to provide [additional] [training/supervision] to [name of officer].

Eleventh Circuit Pattern Jury Instruction (Civil) No. 5.11, Government Entity Liability for Failure to Train or Supervise.

Here, the Complaint fails to allege facts to support these elements. Even assuming the Court agreed that PTS Officer arrested Plaintiff without probable cause, the Complaint fails to allege facts that would have put the County on notice of a need for training prior to December 4, 2019, i.e., the date that laboratory testing disproved the basis of PTS Officer's initial arrest decision (DE 1 at Ex. A). To succeed on a failure-to-train theory, Plaintiff must show a "pattern of similar constitutional violations by untrained employees" because "[w]ithout notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately

chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Next, even after the laboratory returned its confirmation results on December 4, 2019, the Complaint fails to allege facts that show when and how County policymakers (1) became aware of the laboratory test results, (2) became aware of the need for further training, and (3) deliberately ignored this need and instead opted to proceed without further training. At most, the Complaint alleges that PTS Officer herself continued to rely upon screening test results, even after she knew they had been disproven in the past. The actions of a single municipal employee, standing alone, cannot establish *Monell* failure-to-train liability. *See City of Canton*, 489 U.S. at 387. Instead, the municipality itself must make a deliberate decision to forego training, which decision serves as "the moving force" behind the constitutional violation. *Id.* at 388. Count III should therefore be dismissed to the extent it alleges a *Monell* claim based on a failure-to-train theory.

## IV.    RECOMMENDATION & NOTICE OF RIGHT TO OBJECT

For the reasons stated above, the undersigned recommends as follows:

1.    The District Court should **GRANT** Defendants' Motion to Dismiss Plaintiff's Complaint and Incorporated Memorandum of Law (DE 6).

2.    The District Court should dismiss Counts I and III of the Complaint without prejudice. Because Plaintiff may yet be able to allege facts to support a claim, Plaintiff should be afforded leave to file an Amended Complaint within fourteen (14) days of the date this Report and Recommendation becomes final.

3.    In the event Plaintiff chooses not to file an Amended Complaint, the undersigned recommends that the District Court dismiss the remaining state law claims, Counts II and IV, pursuant to 28 U.S.C. §1367(c)(3).

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the District Court. Failure to file objections timely shall bar the parties from a de novo determination by the District Court of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.

**SUBMITTED and RECOMMEDED** in Chambers at West Palm Beach in the Southern District of Florida, this 10th day of February 2023.

_____
RYON M. MCCABE
U.S. MAGISTRATE JUDGE

13